**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**William John SUTTON,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Freddie Goldbaum ORTIZ,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Valentine Frank PROITTE,**
**Defendant-Appellant.**

**Nos. 85–1265, 85–1301 and 85–1307.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 11, 1986.

Decided July 22, 1986.

Susan Ehrlich, Phoenix, Ariz., Eugene Bracamonte, Jon R. Cooper, Tucson, Ariz., for plaintiff-appellee.

Roger S. Auerbach, Adrian G. Hall, Bolding & Zavala, Tucson, Ariz., Stephen Ralls, South Tucson, Ariz., for defendant-appellant.

Before CHOY, ALARCON, and WIGGINS, Circuit Judges.

ALARCON, Circuit Judge:

Appellants are three members of a group that smuggled large quantities of marijuana by air into the United States. They appeal their judgments of conviction on various grounds. We address each contention and the facts pertinent thereto under separate headings.

## I. SUTTON

Defendant-appellant William John Sutton was indicted on nine counts: (1) conspiracy to import more than 50 kilograms of marijuana into the United States in violation of 21 U.S.C. § 963 (Count 1); (2) conspiracy to possess with intent to distribute and to distribute in excess of 50 kilograms of marijuana in violation of 21 U.S.C. § 846 (Count 2); (3) engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848 (Count 3); (4) possession with intent to distribute approximately 1,500, 500 and 600 pounds of marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts 8, 13, 18); and (5) interstate travel in aid of a racketeering enterprise in violation of 18 U.S.C. §§ 2, 1952 (Counts 11, 12, 15).

Sutton pleaded guilty to engaging in a continuing criminal enterprise as charged in Count 3, pursuant to a plea agreement with the government. The government dismissed the eight remaining charges against Sutton in return for his guilty plea. The government also dismissed charges against co-defendants Lynn Ann Morgan, Sutton's longtime female companion, and Tamberly Morgan, Lynn Ann's sister, pursuant to the plea agreement. On August 26, 1985, Sutton was sentenced to 30 years on the continuing criminal enterprise charge.

Roger S. Auerbach represented both Sutton and Lynn Ann Morgan in the proceedings below. Auerbach arranged the plea bargain whereby the charges against Sutton and the Morgan sisters were dropped. Auerbach represents Sutton on this appeal.[1]

Sutton contends that he should be allowed to withdraw his guilty plea because Auerbach's dual representation gave rise to a conflict of interest which deprived him of his right to the effective assistance of counsel. We conclude that the dual representation did not violate Sutton's sixth amendment rights and affirm.

Joint representation is not *per se* violative of constitutional guarantees of effective assistance of counsel. *Holloway v. Arkansas*, 435 U.S. 475, 482, 98 S.Ct. 1173, 1177, 55 L.Ed.2d 426 (1978). In order to establish a violation of the sixth amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980); *United States v. Hoffman*, 733 F.2d 596, 601–02 (9th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 521, 83 L.Ed.2d 409 (1984). A defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. *Cuyler*, 446 U.S. at 349–50, 100 S.Ct. at 1718–19.

Conversely, a sixth amendment violation occurs when an accused timely raises an objection to joint representation based on the risk of a conflict of interest, and the trial judge fails either to appoint separate counsel or to take adequate steps to ascertain whether the risk is too remote to warrant individual representation. *Holloway*, 435 U.S. at 484, 98 S.Ct. at 1178. Thus, whenever a trial court improperly requires joint representation over timely objection based on possible conflicting interests, prejudice is presumed and reversal is automatic. *Id.* at 488–89, 98 S.Ct. at 1180–81.

---

1. Mr. Auerbach was retained by Sutton to represent him at trial. We appointed Mr. Auerbach at Sutton's request to represent him on this appeal.

■ The record reveals that Sutton never objected to Auerbach's joint representation before the trial court. He raises the issue of ineffective assistance of counsel and conflict of interest for the first time on this appeal.[2] Therefore, Sutton must demonstrate that an actual conflict of interest adversely affected Auerbach's performance in order to establish his sixth amendment claim. *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718.

■ When confronted with joint representation, the court has the duty of assuring itself that the defendants are aware of their right to separate counsel. Fed.R. Crim.P. 44(c). Rule 44(c) provides that "the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation."

■ The district court fully complied with Rule 44(c). Sutton was told that because he was subject to severe penalties, there was a possibility that a conflict in representation could arise. Sutton and Auerbach represented to the court that they were satisfied that no conflict existed.[3] Sutton again stated to the court dur-

2. Sutton contends Lynn Ann Morgan's motion to sever filed on April 10, 1985 presented the conflict of interest issue to the district court. He argues that Morgan's motion constituted a proper objection to joint representation on Sutton's behalf, thus invoking the less stringent *Holloway* standard. This contention lacks merit. Morgan's motion to sever did not refer to a conflict of interest nor object to joint representation. It simply requested separate trials because Sutton possessed information favorable to Morgan's defense to which he could not testify unless the trials were separate.

Sutton also appears to argue the district judge abused his discretion in denying Morgan's motion to sever. The test for determining abuse of discretion in denying severance under Fed.R. Crim.P. 14 is whether a joint trial would be so prejudicial that the trial judge could exercise his discretion in only one way. *United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir.1980). The ruling of the trial judge will rarely be disturbed on appeal. *Id.* Morgan's motion was properly denied because Sutton's supporting "affidavit" was insufficient; the unsworn statement said only that Sutton possessed information favorable to Morgan's defense. The burden was on Morgan to show that she would be significantly prejudiced by a joint trial. *Id.* Sutton's unsworn statement, devoid of any detail, fell far short of meeting this burden. *United States v. Coplen*, 541 F.2d 211, 216 (9th Cir.1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 791 (9th Cir.1977). In any event, Morgan's motion only addressed the possibility that she would be prejudiced by a joint trial. Prejudice to Sutton was never raised. Sutton did not move for a severance. Morgan's motion to sever did not concern Sutton's right to a separate trial. Sutton may not challenge the denial of Morgan's motion to sever on this appeal. *See United States v. Whitten*, 706 F.2d 1000, 1012 (9th Cir.1983) (an issue not presented to the trial court cannot be raised for the first time on appeal), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984).

3. At a hearing on pending motions on April 23, 1985, the following colloquy took place:

THE COURT: Mr. Sutton, you are represented by the same attorney that represents Lynn Morgan. You are aware of that?

MR. SUTTON: Yes, sir.

THE COURT: Have you discussed with Mr. Auerbach the possibility of any possible conflict that might arise during the trial, or during the preparation of the trial?

MR. SUTTON: Yes, sir.

THE COURT: I notice that there is a motion for severance where he says that you would be willing to testify on behalf of the two Morgan Defendants; is that correct?

MR. SUTTON: Yes, sir.

THE COURT: Well, I need to tell you that to protect your constitutional rights, and you may have discussed this with Mr. Auerbach, that I have to inform you of possibility of conflicts that may exist and may not. This is a decision you are going to have to make.

Of course you are charged with very serious charges, and you have an attorney whose job it is to do his best to see that you are not convicted of these charges. There are many defendants, as I said, Mr. Auerbach represents Lynn Morgan, also. You know that you are subject to some severe penalties if you should be found guilty of these charges? I don't know enough about the case to know what possible conflict could arise at this point. You are entitled to have an attorney who has absolutely no divided interest.

I don't know what kind of defense you will have, whether it will be a conflict between your witnesses and the witnesses that would represent or testify for Lynn. It may put your attorney in a position where he may have talked to witnesses as your attorney, and find himself in a conflict as to what he can ask these witnesses if they are testifying for some other defendant. And I just want to make sure that you have discussed this with Mr. Auerbach, and that you are satisfied that there

ing the hearing on his change of plea that he was satisfied with Auerbach's representation.[4] Nonetheless Sutton now contends an actual conflict existed in this case because the plea agreement arranged by Auerbach sacrificed Sutton's rights to secure a benefit for Lynn Ann Morgan.

The Supreme Court was presented with an analogous situation in *Dukes v. Warden*, 406 U.S. 250, 92 S.Ct. 1551, 32 L.Ed.2d 45 (1972). Dukes pleaded guilty on the advice of two lawyers, one of whom also represented Duke's co-defendants on an unrelated charge. Dukes later learned that his lawyer had sought leniency for the co-defendants by arguing that their cooperation with the police induced Dukes to plead guilty. Dukes argued in the Supreme Court that his lawyer's conflict of interest had infected his plea. The Supreme Court found "nothing in the record ... which would indicate that the alleged conflict resulted in ineffective assistance of counsel and did in fact render the plea in question involuntary and unintelligent." *Id.* at 256–57, 92 S.Ct. at 1554–55. Because Dukes did not identify an actual lapse in representation, the Supreme Court affirmed the denial of habeas corpus relief. *See Cuyler,* 446 U.S. at 349, 100 S.Ct. at 1718.

 Similarly, Sutton has not identified an actual lapse in Auerbach's representation leading to Sutton's guilty plea. To the contrary, both of Auerbach's clients benefited considerably from his representation and the plea agreement. Although Sutton pleaded guilty, it was to only one of nine counts in the indictment. The charges against Lynn Ann Morgan were dismissed. Sutton's subsequent discontent with the sentence imposed on the one count does not establish a lapse in representation that resulted in ineffective assistance of counsel.

 The proper standard for attorney performance is that of reasonably effective assistance. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). "[A] guilty plea cannot be attacked as based on inadequate legal advice unless counsel was not 'a reasonably competent attorney' and the advice was not 'within the range of competence demanded of attorneys in criminal cases.'" *Id.* (quoting *McMann v. Richardson,* 397 U.S. 759, 770, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970)); *see also Hill v. Lockhart,* — U.S. —, 106 S.Ct. 366, 369, 88 L.Ed.2d 203 (1985) (where a defendant is represented by counsel during the plea process and enters a plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases). When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2065.

 Auerbach's representation of Sutton in this case was within the accept-

is no possible conflict at all in Mr. Auerbach representing you, and Ms. Morgan.
Are you satisfied with that?
MR. SUTTON: Yes, sir.
THE COURT: You have considered the possibility of any possible conflict arising because of the joint representation; is that correct?
MR. SUTTON: Yes, sir.

. . . . .

THE COURT: Mr. Auerbach, I assume you have discussed this with both Ms. Morgan and Mr. Sutton, and you are satisfied at this stage that there is no possibility of conflict.
MR. AUERBACH: That's correct, Your Honor.
THE COURT: Okay, fine.
Reporter's Transcript 4–23–85 pp. 6–8.

4. The following colloquy occurred when Sutton changed his plea:
THE COURT: Are you satisfied with Mr. Auerbach's representation in this matter; that is, has he been available to you, and freely answered your questions and consulted with you?
MR. SUTTON: As of right now, yes.
THE COURT: Why do you say "as of right now"? He's going to continue to be your attorney until I relieve him. So he will be your attorney through the sentencing in this matter.
Is that satisfactory with you?
MR. SUTTON: Yes.
Reporter's Transcript 7–8–85 p. 8.

able range of competence and did not fall below the objective standard of reasonableness. *Id.* Counsel may advise a defendant to plead guilty "if that advice falls within the range of reasonable competence under the circumstances." *United States v. Cronic,* 466 U.S. 648, 656–57 n. 19, 104 S.Ct. 2039, 2045 n. 19, 80 L.Ed.2d 657 (1984). Auerbach's advice to Sutton to plead guilty to one of nine counts was reasonable under the circumstances of this case. The government advised the trial court that it was prepared to go to trial on all nine counts charged in the indictment. In fact, the eight counts against Sutton which were dismissed constituted the series of violations on which the continuing criminal enterprise charge was based. In admitting guilt to the continuing criminal enterprise charge, Sutton effectively admitted he was guilty of the eight counts which were dismissed. Moreover, Sutton does not maintain on appeal that he is innocent of the charges in the indictment or that a plausible defense to those charges exists.

■■■ Sutton's final argument in his attempt to set aside his guilty plea is that his plea was coerced "under threat of prosecution and imprisonment of his female companion, who is the mother of his children...." The district judge specifically explained to Sutton that if he felt "threatened, or coerced, or under duress, or ... have been promised something which you're not sure that whoever promised it to you can deliver, then you shouldn't enter a plea of guilty." Reporter's Transcript 7–8–85 pp. 15–16. When the district judge asked Sutton if he understood, Sutton replied in the affirmative. *Id.* at 16.

Furthermore, Sutton's reliance on *Marrow v. United States,* 772 F.2d 525 (9th Cir.1985) is misplaced. In *Marrow,* the district court denied the prisoner's petition for writ of habeas corpus without first holding an evidentiary hearing. We remanded for a hearing on whether the defendant's plea was involuntary because the defendant had alleged in "sufficient detail that his plea was coerced by threats that [his longtime female companion] would be imprisoned if he did not plead guilty." *Id.* at 527. Unlike the present case, the female companion in *Marrow* was not an indicted co-defendant. Lynn Ann Morgan was charged in the indictment with serious felony charges which, if proven, carried substantial penalties including imprisonment.[5] Furthermore, Sutton's bald assertion that he was coerced is unsupported by any facts in this record. This bare allegation of coercion, presented before this court for the first time, is not sufficient to set aside the plea of guilty on this direct appeal.

Sutton has not demonstrated an actual conflict of interest or lapse in representation. Furthermore, he was carefully admonished by the district court concerning the hazards of joint representation and the possibility of a conflict of interest concerning the penalty he might face. The record establishes that Sutton was adequately represented by Auerbach and there was no violation of Sutton's right to effective assistance of counsel.

## II. PROITTE

Defendant-appellant Valentine Frank Proitte was charged by indictment filed July 10, 1984 with conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1), 846 (Count 1), and possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 2). He was charged under the name Walter Marrero. On October 3, 1984, Proitte pleaded guilty under his true name to both counts pursuant to a plea agreement with the government. In return for Proitte's guilty plea, the government agreed that it

---

**5.** Morgan was indicted for: (1) conspiracy to possess with intent to distribute in excess of 50 kilograms of marijuana in violation of 21 U.S.C. § 963 (Count II); and (2) aiding and abetting interstate travel in aid of a racketeering enterprise in violation of 18 U.S.C. §§ 1952, 2 (Count XV). The former violation carries a maximum penalty of a 20 year term of imprisonment and a fine of $250,000. 21 U.S.C. § 841(b)(1)(A). The latter crime carries a maximum penalty of five years imprisonment and a $10,000 fine. 18 U.S.C. § 1952.

would "not file any charges against the Defendant based on conduct known to the government." It was also agreed that Proitte would "not be cooperating, debriefing, interviewing, or provid[ing] any other form of testimony."

On February 26, 1985, Proitte was charged in a second superseding indictment with two additional counts: (1) False Statement in a Currency Transaction Report (CTR) in violation of 18 U.S.C. § 1001 (Count 5); and (2) Interstate Travel in Aid of Racketeering in violation of 18 U.S.C. §§ 1952, 2 (Count 11). On April 22, 1985, Proitte filed a motion to dismiss the counts against him in the second superseding indictment claiming a violation of the October 3, 1984 plea agreement. This motion was heard on May 20–21, 1985 and denied. Proitte renewed the motion at hearings on August 16 and 21, 1985. The district court denied this motion as well. The jury found Proitte guilty of both counts in the second superseding indictment.

Proitte contends on appeal that the counts alleged in the second superseding indictment violated the plea agreement. We disagree. The district court found: (1) the plea agreement provided that the government would not prosecute Proitte based on conduct actually known to it on October 3, 1984; (2) the government did not have actual knowledge on October 3, 1984 that Proitte engaged in the acts constituting the bases for the two superseding indictment counts. These findings were not clearly erroneous.

■■■ Although a plea bargain is a matter of criminal jurisprudence, such an agreement is contractual in nature and must be measured by contract law standards. *United States v. Read,* 778 F.2d 1437, 1441 (9th Cir.1985); *see also United States v. Ouan,* 789 F.2d 711, 713–14 (9th Cir.1986). Thus, any dispute over the terms of the agreement will be determined by objective standards. *Read,* 778 F.2d at 1441. To determine whether a plea agreement was violated, we first determine "what the parties to the plea bargain reasonably understood to be the terms of the

agreement." *Id.* (quoting *United States v. Arnett,* 628 F.2d 1162, 1169 (9th Cir.1979). What the parties agreed to "is a question of fact to be resolved by the district court." *Id.* (quoting *United States v. Krasn,* 614 F.2d 1229, 1233 (9th Cir.1980)). Accordingly, the district court's findings as to the terms of a plea agreement are reviewed only for clear error. *Id.*

■■■ The bargain included a commitment by the government that it would not "file any charges against the Defendant based on conduct known to the government." Proitte does not argue that the government had actual knowledge on October 3 that he committed the crimes charged in the superseding indictment. He argues instead that the government had "sufficient information [prior to October 3] to lead them to the belief that the criminal activity alleged in the Second Superseding Indictment had occurred and that the appellant had participated in it."

The terms of the agreement are clear. They do not support Proitte's constructive knowledge argument. The words "conduct known to the government" cannot fairly be construed as "conduct that reasonably could have been known." Based on the plain language of the agreement, the district court did not clearly err in finding that the parties reasonably understood the terms of the agreement to be that Proitte would not be prosecuted for criminal activity actually known to the government on October 3, 1984.

■■■ The district court also did not clearly err in finding that the conduct charged in the superseding indictment was not known to the government on October 3, 1984.

Count 5 of the second superseding indictment charged Proitte with making a false statement in a CTR. According to the superseding indictment, on October 28, 1983 Proitte identified himself as "Christopher Bowles" in a CTR. The superseding indictment also alleges that Proitte presented a fictitious Arizona driver's license in the name of "Christopher Bowles" to bank

cashier Susan Duffy in order to obtain a $24,000 cashier's check for the fictitious company "Rico Excavating."

The government knew on October 3, 1984 that a $24,000 cashier's check had been used to purchase an airplane used in the smuggling operation. It did not know until the bank first produced the CTR on October 5, 1984, however, that a false name may have been used on this document. Until the CTR became available, the government did not know that the person purchasing the check had used a false name. The government became suspicious that Proitte might be involved with the CTR on October 5, 1984 when it learned the name Christopher Bowles had been used on the document. Proitte had used that name as an alias and had presented identification in that name in the past. However, the government did not have actual knowledge that Proitte had purchased the cashier's check until October 19, 1984. On that day, Susan Duffy, the teller who handled the October 28, 1983 transaction, tentatively identified a photograph of Proitte as the person who had purchased the check.

Although the name Rico Excavating appeared as the name of the purchaser on the cashier's check and the government knew prior to October 3, 1984 that Proitte had used the name John Rico as an alias, these facts do not demonstrate that the government had actual knowledge that Proitte purchased the check. The government did not have actual knowledge that Proitte was the actual purchaser of the check until Susan Duffy identified Proitte as Bowles on October 19, 1984.

■ Count 11 of the second superseding indictment charges Proitte with Interstate Travel in Aid of Racketeering. Count 11 alleges that Proitte and co-defendant Francesca Campbell travelled from Arizona to South Carolina on February 22, 1984 for the purpose of delivering 1,100 pounds of marijuana. The superseding indictment further alleges that Proitte and Campbell received $846,000 in payment for the drug, and that Campbell and another individual transported the money back to Ryan Field, Arizona.

The government did not have actual knowledge on October 3, 1984 that Proitte had transported 1,100 pounds of marijuana to South Carolina in February of 1984 as charged in the superseding indictment. The government knew the following facts on October 3, 1984: (1) On February 24, 1984, Francesca Campbell and another individual arrived at Ryan Field, Arizona from Spartanburg, South Carolina with $846,000 in their possession; (2) a phone call had been made from Campbell's Spartanburg hotel room to a Ft. Mill, South Carolina hotel room registered in the name of Walter Marrero; (3) Proitte has used the name Marrero in the past; and (4) there had been phone calls from the Marrero hotel room to co-defendant Sutton's residence in Tucson. Although these facts may be sufficient to establish a "conspiratorial connection" between Proitte, Campbell, and Sutton, Proitte was not charged with conspiracy in the second superseding indictment. He was charged with interstate transportation in aid of racketeering, i.e., transporting marijuana from Arizona to South Carolina in furtherance of the smuggling operation.

The government did not have actual knowledge that Proitte had transported the marijuana until December 6, 1984. On that day, Douglas Riddinger, Proitte's fellow inmate during a prior detention, told a government agent that Proitte had admitted to him that he had transported marijuana to South Carolina in February, 1984.

Proitte's claim that the government learned in February, 1984 from another government witness, Alan Kaniss, that Proitte had transported marijuana to South Carolina is not supported by the record. In February, 1984, Kaniss told federal officers that Sutton had negotiated with Marrero to transport a 550 pound load of marijuana to South Carolina. The government did not know if the proposed shipment of 550 pounds of marijuana had been carried out. The government did not learn until April, 1985, that a shipment of 550 pounds of marijuana had gone to the northwestern

part of the United States. The shipment of 550 pounds of marijuana referred to by Kaniss was not the 1,100 pound South Carolina transaction that formed the basis of the new charges against Proitte.

■ Prior to October 3, 1984, the government did not have actual knowledge that Proitte had committed the violations charged in the superseding indictment because of his use of eight aliases. It was not until after October 3, 1984 that the government had actual knowledge of the facts forming the basis of the specific charges in Counts 5 and 11. Accordingly, the filing of the charges in the second superseding indictment did not violate the October 3, 1984 agreement.

## III. ORTIZ

Defendant-appellant Freddie Goldbaum Ortiz was charged with: (1) Conspiracy to Import Marijuana in violation of 21 U.S.C. §§ 952(a), 960(b)(2)(3), 963, 853 and 18 U.S.C. § 2 (Count 1); (2) Conspiracy to Distribute Marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846 (Count 2); and (3) Possession with Intent to Distribute Marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 14). On April 22, 1985, Ortiz joined in co-defendant Saucedo's motion to suppress evidence seized during a traffic stop. The district court denied the motion to suppress. Ortiz also filed a motion to sever his trial from that of the other co-defendants. The district court denied his motion to sever. On August 26, 1985, a jury found Ortiz guilty of the conspiracy charges in Counts 1 and 2 but acquitted him of the possession charge in Count 14.

Ortiz appeals the denial of his motion to suppress on the ground that the record does not support the trial court's finding that the sheriff's deputies had a founded suspicion to make the investigatory stop of Ortiz's vehicle. Ortiz also appeals the denial of his motion to sever. He claims that he was denied his sixth amendment right to cross-examine co-defendant Saucedo regarding his out-of-court admission revealed during trial which implicated Ortiz.

### A. Motion To Suppress

■ We review *de novo* whether there was founded suspicion justifying an investigatory stop under the fourth amendment. *United States v. Maybusher,* 735 F.2d 366, 371 (9th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985)

On April 4, 1984 in an isolated location near Bowie, Arizona, United States Customs officials were conducting an air and ground surveillance of a vehicle used by the smuggling organization. At approximately 2:30 p.m., the ground surveillance team spotted a low-flying red and white high-wing airplane flying north. The officers intercepted the message "No go, no go, airplanes and helicopters, go to Bombers Square" over radio frequency 123.45. Bombers Square is an isolated, abandoned military landing field commonly used for smuggling drops. Customs officials had observed on prior occasions the red and white airplane drop marijuana bales at Bombers Square and then fly into Mexico.

The surveillance team contacted the Customs office in Tucson and requested that law enforcement officers be dispatched to Bombers Square. The Pinal County Sheriff's Department was also notified. Sergeant David Harrington was sent to Bombers Square.

At about 3:15 p.m., a Customs officer surveilling Bombers Square spotted a pick-up truck with a camper shell on the airstrip. After the officer had been in the area for a period of time, he heard over frequency 123.45 several clicks and the words "Hey, hey, hey, hey...." At the same time, at approximately 3:30 p.m., he observed a white with dark trim single engine, high-wing Cessna making a low-level pass over Bombers Square. A more detailed identification was not possible. The airplane did not land but turned and flew south.

Sometime after Sheriff's Deputy Harrington arrived at Bombers Square he observed a tan pick-up truck with a camper top on the landing strip. Deputy Harring-

ton observed a white and dark colored airplane fly over the landing strip. He was not close enough to make a more detailed identification. Approximately 20 minutes after the aircraft flew over the strip, Deputy Harrington stopped the pick-up as it was leaving Bombers Square. Ortiz consented to a search of the vehicle. Two lanterns and a ground-to-air radio were seized. The radio was turned to frequency 123.45 but the batteries were almost dead. Lanterns of the type seized are commonly used to guide planes in night landings. The vehicle also contained green trash bags. The windows of the camper shell were covered with green plastic.

■■■ Law enforcement officers must have a "founded suspicion" of criminal conduct to justify an investigatory stop. *Maybusher*, 735 F.2d at 371; *cf. United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (an investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity). Founded suspicion exists when an officer is aware of specific articulable facts, together with the rational inferences drawn therefrom, that reasonably warrant suspicion that the person to be detained may have committed or is about to commit a crime. *Maybusher*, 735 F.2d at 371; *United States v. Burnette*, 698 F.2d 1038, 1047 (9th Cir.), *cert. denied*, 461 U.S. 936, 103 S.Ct. 2106, 77 L.Ed.2d 312 (1983).

■■■ We review the totality of the circumstances to determine whether there was founded suspicion to stop Ortiz's vehicle. *Cortez*, 449 U.S. at 417, 101 S.Ct. at 695 (the "whole picture" must be taken into account). We look to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually makes the stop. We agree with the Tenth Circuit that the collective knowledge rule applies where an officer makes an investigatory stop based in part on information or directions from other law enforcement officials. *United States v. Merritt*, 695 F.2d 1263, 1268 & n. 9 (10th Cir.1982), *cert. denied*, 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983).

■■ Our review of the record supports the district court's conclusion that the officials conducting the surveillance on April 4, 1984, had a founded suspicion that Ortiz's vehicle was involved in criminal activity. The officers were aware of the following facts: (1) a low-flying aircraft which appeared to be similar to an airplane previously observed in smuggling activities was sighted at Bowie, Arizona; (2) the message "No go, no go ... go to Bombers Square" was heard over a radio frequency used by drug smugglers; (3) Bombers Square was a commonly used smuggling area, *see United States v. Hickman*, 523 F.2d 323, 327–28 (9th Cir.1975) (articulable fact is stop area being noted for high number of smuggling violations), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976); (4) Bombers Square had been used previously by the same organization for a drug drop; (5) Ortiz and Saucedo were observed in the remote desert area at Bombers Square in a vehicle used in the smuggling organization, *see United States v. Post*, 607 F.2d 847, 850 (9th Cir.1979) (actions were consonant with drug owners), *overruled on other grounds, United States v. McConney*, 728 F.2d 1195 (9th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984); (6) officers observed a low-flying plane over Bombers Square similar to the one previously observed at Bowie; (7) the officers intercepted a radio communication over frequency 123.45 at Bombers Square.

Deputy Harrington was aware of the following facts before he stopped the pick-up truck: (1) he saw the low-flying plane over Bombers Square; (2) he observed Ortiz's vehicle sitting on the landing strip.

There is no question that the collective information known by the officers justified the stop of Ortiz's vehicle. Based on their experience in the investigation of smuggling activities, the Customs officials properly inferred from these facts that a drug

drop had been attempted first at Bowie and then again at Bombers Square. *See Cortez,* 449 U.S. at 419, 101 S.Ct. at 695–96 (founded suspicion can be based on inferences drawn from innocent appearing facts by experienced officers). The articulable facts known by Deputy Harrington combined with those known by the Customs officials, *see Hickman,* 523 F.2d at 327–28 (cumulative impact of known facts is considered), reasonably warranted the suspicion that Ortiz's vehicle was involved in a drug drop. *See Burnette,* 698 F.2d at 1047 (the officer's knowledge plus their observations, provided founded suspicion).

■ The fact that Deputy Harrington did not actually observe any criminal activity is irrelevant as "the facts are measured against an objective reasonable man standard, not the subjective impressions of the particular officer." *United States v. Mallides,* 473 F.2d 859, 861 (9th Cir.1973). It is irrelevant that the vehicle could have been at Bombers Square for innocent purposes. The test is not whether the conduct under question is consistent with innocent behavior; law enforcement officers do not have to rule out the possibility of innocent behavior. *United States v. Holland,* 510 F.2d 453, 455 (9th Cir.), *cert. denied,* 422 U.S. 1010, 95 S.Ct. 2634, 45 L.Ed.2d 674 (1975).

We hold that under these circumstances the officer had a "particularized and objective basis" for making the investigatory stop of Ortiz's vehicle. *Cortez,* 449 U.S. at 417, 101 S.Ct. at 695. The district court did not err in denying the motion to suppress.

### B. Motion To Sever

■ The district court denied Ortiz's motion for a severance of his trial from that of his co-defendants. *See* Fed.R. Crim.P. 14. The standard of review for a denial of a motion to sever is abuse of discretion. *United States v. Hsieh Hui Mei Chen,* 754 F.2d 817, 823 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985). The test for determining abuse of discretion in denying a severance under Rule 14 is "whether a joint trial would be so prejudicial that the trial judge could exercise his discretion in only one way." *United States v. Escalante,* 637 F.2d 1197, 1201 (9th Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980). "Before this court will reverse a conviction because of a district court's refusal to grant severance, 'the defendant must show that failure to sever was so manifestly prejudicial that it outweighed the dominant judicial concern with judicial economy and compelled the exercise of the trial court's discretion to sever.'" *United States v. Little,* 753 F.2d 1420, 1446 (9th Cir.1984) (quoting *United States v. Seifert,* 648 F.2d 557, 563 (9th Cir.1980)). The defendant must show a violation of one of his substantive rights, such as denial of the sixth amendment right to confrontation, in order to make a showing of such manifest prejudice. *See id.*

Ortiz contends manifest prejudice resulted from the denial of his motion to sever because he was deprived of his sixth amendment right to cross-examine an adverse witness under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In *Bruton,* a government witness testified at trial that Bruton's co-defendant had orally confessed to him that Bruton and the co-defendant had committed the armed robbery for which they were being prosecuted. *Bruton,* 391 U.S. at 124, 88 S.Ct. at 1621. The trial court instructed the jury that the testimony was only admissible as to the co-defendant and should not be considered in determining Bruton's guilt or innocence. *Id.* at 125, 88 S.Ct. at 1622. The Supreme Court held that "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [Bruton's] guilt, admission of [the co-defendant's] confession in this joint trial violated [Bruton's] right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Id.* at 126, 88 S.Ct. at 1622. The Court stated: "Plainly, the introduction of [the co-defendant's] confession added sub-

stantial, perhaps even critical weight to the Government's case in a form not subject to cross-examination, since [the co-defendant] did not take the stand. [Bruton] thus was denied his constitutional right of confrontation." *Id.* at 127–28, 88 S.Ct. at 1623.

Ortiz was tried with co-defendants Albert Saucedo and Valentine Proitte. On the fourth day of trial, the government introduced the testimony of Kathy Ledbetter, Albert Saucedo's girlfriend. Prior to Ledbetter's testimony, the district court gave the following instruction to the jury:

> Ladies and gentlemen, the testimony that you are going to hear at this time is to be considered only as to the Defendant Saucedo, and is not to be considered in any way in determining the guilt or innocence of the other Defendants in this case.

Ledbetter testified that in "about April" of 1984, Saucedo had told her "that he had been out to catch a load, and that the plane didn't show up, but when they were leaving, they were stopped by the police, and they confiscated the radio, and the lanterns...." Ledbetter did not expressly refer to Ortiz. Ortiz objected to Ledbetter's testimony concerning Saucedo's admission and moved for a mistrial. The trial court denied the motion stating that its limiting instruction was sufficient to overcome any prejudice to Ortiz.

■ Although Saucedo's admission to his girlfriend did not refer to Ortiz, the circumstances of this case present a close question regarding *Bruton* error. Assuming arguendo that the admission of Ledbetter's testimony violated *Bruton*, we conclude that this testimony was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

It is clear that *Bruton* error does not require an automatic reversal. *United States v. Vissars*, 596 F.2d 400, 403 (9th Cir.1979). In *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), the Supreme Court decided that un-

der some circumstances, a *Bruton* violation could be harmless beyond a reasonable doubt under *Chapman v. California. Id.* at 254, 89 S.Ct. at 1728. In *Harrington,* the Supreme Court held that the purported *Bruton* violation was harmless beyond a reasonable doubt because of the overwhelming evidence of the guilt of the accused and the relatively insignificant impact of the co-defendants' largely cumulative statements. *Id.*

In *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), the Supreme Court stated:

> The mere finding of a violation of the *Bruton* rule ..., however, does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of the guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.

*Id.* at 430, 92 S.Ct. at 1059; *see also United States v. Guerrero,* 756 F.2d 1342, 1348 (9th Cir.1984) (violations of the *Bruton* rule do not require reversal if the other evidence of guilt was overwhelming and the prejudice to the defendant from the co-defendant's admission slight by comparison).

The record in this case reveals that the alleged *Bruton* violation was harmless beyond a reasonable doubt. The properly admitted evidence of Ortiz's guilt of the conspiracy charges is overwhelming. Ortiz was observed on numerous occasions with other members of the smuggling operation, sometimes at Sutton's residence in Tucson. Ortiz's presence at Bombers Square, a deserted area in the desert, in a truck known to be used by members of the smuggling organization, combined with the timing of events between Bowie and Bombers Square on April 4, 1984 involving previously known participants of the illegal operation leaves no doubt that Ortiz was a member of the drug conspiracy. The fact that

the windows of the pick-up truck were taped over with garbage bags and Ortiz's possession of a ground-to-air radio tuned to frequency 123.45 supports the conclusion that he was part of the conspiracy to smuggle marijuana.

We are satisfied that Ledbetter's testimony concerning Saucedo's admission had an insignificant impact, if any, upon the minds of the jurors who found Ortiz guilty of the conspiracy charges. Assuming, without deciding, that this testimony violated *Bruton*, it was harmless beyond a reasonable doubt. The district court did not err in denying the motion to sever.

## IV. CONCLUSION

Sutton's guilty plea should not be set aside because he has not shown an actual conflict of interest or lapse in representation. The record establishes that Sutton was adequately represented by Auerbach. There was no violation of Sutton's sixth amendment right to effective assistance of counsel.

The district court did not clearly err in finding that the government did not have actual knowledge on October 3, 1984 that Proitte committed the violations charged in the second superseding indictment. Prosecution of the charges in the superseding indictment did not violate the October 3, 1984 plea agreement.

The district court properly denied defendant Ortiz's motion to suppress evidence seized during the stop of his vehicle on April 4, 1984. The record establishes that Deputy Harrington had a particularized and objective basis for making the investigatory stop of Ortiz's vehicle. Ortiz's motion to sever also was properly denied. The *Bruton* error, if any, was harmless beyond a reasonable doubt in light of the overwhelming evidence connecting Ortiz to the conspiracy and the relatively insubstantial impact of the challenged testimony on Ortiz's conviction.

AFFIRMED.