2 F.3d 1158
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles Wilson CHESTER, Defendant-Appellant.
 No. 92-10576.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 17, 1993.
Decided Aug. 2, 1993.
 
 Before FAIRCHILD,* BEEZER and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 I. OVERVIEW
 
 2
 Charles Wilson Chester was convicted of bank robbery, 18 U.S.C. Sec. 2113(a) & (d), and use of a deadly weapon in the commission of a crime of violence, 18 U.S.C. Sec. 924(c). Chester raises the following issues on appeal: (1) whether the officers' decision to stop and question him was based upon a founded suspicion; (2) whether the stop and questioning amounted to an arrest; (3) whether Chester's consent to the warrantless search of his automobile was tainted; and (4) whether the identification procedure employed at the scene of the crime was proper. Based on the discussion below, we affirm.
 
 II. FACTS
 
 3
 On July 1, 1991, Charles Wilson Chester robbed the First Western Savings Association in Las Vegas, Nevada. Chester left the bank with approximately $849.00 and, unbeknownst to him, a B-pack device which enables law enforcement to electronically track stolen money. At this time, the suspect was described to law enforcement officials as a Latin male, age 30-35, approximately five feet, eleven inches, 170 pounds, wearing a light blue shirt with white stripes, blue pants, a baseball cap and see-through sunglasses. Additionally, the officers were informed that the suspect, who had displayed a .38 calibre revolver during the robbery, placed the money and the revolver into a manila envelope before departing from the bank.
 
 
 4
 Officers from the Las Vegas Metropolitan Police Department (LVMPD or Metro) and the Federal Bureau of Investigation traced the signal emitted from the B-pack to an ARCO AM/PM service station in Henderson, Nevada. Several police vehicles arrived in the area within a short period of time. At the station, Sergeant Ken Hefner retrieved the B-pack from a garbage can near the AM/PM service station gas pumps. Officer Wally Johnson observed an individual similar to the dispatch description of the suspect, also noticing his wavy hair, which in his view was similar to that of a Latin. This individual was wearing amber or rose colored see-through sunglasses. According to Johnson, this individual, later identified as Chester, was wandering aimlessly about the service station and would not maintain eye contact with him.
 
 
 5
 Officer Johnson, along with Detective Michael Karstedt, approached Chester at a construction site adjacent to the AM/PM property. Detective Karstedt identified himself and told Chester that Metro was investigating a robbery and that he generally fit the description of the suspect. Karstedt requested identification, upon which Chester produced identification in the name of Ronald Smith (the officers were unaware that the ID was false at this time). The officers requested that Chester accompany them to the patrol vehicle approximately 40 feet away, ostensibly due to the noise of the construction work nearby. Chester agreed.
 
 
 6
 While standing at the patrol vehicle, the officers asked Chester how he had arrived at the service station; he responded that he had walked and that he did not have a car. At this time, Sgt. Hefner approached and indicated to Karstedt that he had observed Chester park a blue Camaro in the service station parking lot and exit the vehicle. Karstedt returned to Chester and asked if the Camaro was his--Chester responded affirmatively. Karstedt, in the presence of Officer Johnson, then asked Chester for permission to search the vehicle. According to the officers' testimony, Chester calmly said yes and handed over his car keys. Karstedt repeated his request, and again, Chester responded affirmatively.
 
 
 7
 Upon approaching the vehicle, Detective Karstedt observed a "brown, manila-type envelope" such as was reportedly used during the robbery, a blue baseball cap, and an aqua blue shirt with light striping. Karstedt additionally retrieved a .22 caliber loaded pistol. Chester admitted that the pistol was his and indicated that there was a second gun in the brown manila envelope (the manila envelope was later found to contain a .357 caliber Smith & Wesson revolver and approximately $746 cash). Karstedt ordered Detective Darlene Falvey to place Chester under arrest. Falvey advised Chester of his Miranda rights. No more than five minutes had elapsed between the time of the initial questioning and the arrest.
 
 
 8
 At approximately the same time as the arrest, the officers conducted an on the scene "show-up" with the victim-teller, Michael Roth. At Roth's request, Chester was instructed to wear the hat and shirt recovered from Chester's vehicle. Roth then identified Chester as the individual who had robbed the teller station.
 
 III. DISCUSSION
 
 9
 A. Whether the Decision to Stop and Question Chester was Based on a Founded Suspicion that He had Committed a Crime
 
 
 10
 Chester first argues that the officers detained and questioned him without a properly founded suspicion that he had committed a crime. To justify an investigative stop, law enforcement officers must have a founded suspicion of criminal conduct. United States v. Sutton, 794 F.2d 1415 (9th Cir.1986); Terry v. Ohio, 392 U.S. 1 (1989). A founded suspicion exists "when an officer is aware of specific, articulable facts, together with the rational inferences drawn therefrom, that reasonably warrants suspicion that the person to be detained may have committed, or is about to commit, a crime." Sutton, 794 F.2d at 1426. The facts supporting the officer's reason to stop and question a suspect "must exist when the officer initiates the stop" and cannot be based on information he receives afterward. United States v. Thomas, 863 F.2d 622, 625 (9th Cir.1988). In evaluating the lawfulness of the stop, we take into account the "totality of the circumstances". Id.; United States v. Cortez, 449 U.S. 411, 417-18 (1981).
 
 
 11
 In this case, the suspect was described to officers as a Latin male, approximately five feet, eleven inches, 170 pounds, wearing a light blue shirt with white stripes, blue pants, a baseball cap and see-through sunglasses. The B-pack led the officers to the ARCO AM/PM service station. Upon arrival, Officer Johnson observed an individual similar to the dispatch description of the suspect. At an evidentiary hearing, Johnson described Chester as a black male, light skinned, wavy hair, and wearing blue pants and see-through amber or rose colored sunglasses. According to Johnson, this individual was wandering aimlessly about the service station and would not maintain eye contact. Officer Karstedt described Chester in a similar manner.
 
 
 12
 The circumstances here are sufficient to support the stop. Chester's presence at the location of the electronic device within a short period after the robbery, the similarities in his general appearance with that of the description of the robber, and his aimless and suspicious behavior at the service station, taken together, are reasonably sufficient to warrant the stop.
 
 
 13
 B. Did the Stop and Questioning Amount to an Arrest?
 
 
 14
 Chester contends that his initial detention amounted to an arrest without probable cause. Chester states that "[h]is free will was overborne from the time Officer Johnson and Detective Karstedt approached him and began asking him questions." Appellant's Brief at 11. We look to the totality of the circumstances to determine whether an investigative detention has ripened into an arrest. Eberle v. Anaheim, 901 F.2d 814, 819 (9th Cir.1990); United States v. Baron, 860 F.2d 911, 914 (9th Cir.1988), cert. denied, 490 U.S. 1040 (1989). "[W]e review the situation from the perspective of the person seized." Eberle, 901 F.2d at 819 (quoting United States v. Delgadillo-Velasquez, 856 F.2d 1292, 1295 (9th Cir.1988)). A defendant is in custody when, based upon a review of all the relevant facts, a reasonable innocent person in such circumstances would conclude that, after brief questioning, he or she would not be free to leave. United States v. Pinion, 800 F.2d 976, 978-79 (9th Cir.1986), cert. denied, 480 U.S. 936 (1987). Whether an investigatory stop has become a full fledged arrest, requiring probable cause, depends in part on the duration of the detention. United States v. Mondello, 927 F.2d 1463, 1471 (9th Cir.1991) (30 minute detention under the circumstances did not amount to an arrest). " 'An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.' " Id. (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)).
 
 
 15
 Chester does not suggest which statements by the officers, if any, made him feel as though he would not be not free to leave after brief questioning. Chester was asked three or four questions concerning his identity and means of arrival at the service station. According to the officers' testimony, the questioning took no more than three to five minutes. Although Chester was asked to accompany the officers to their vehicle, he was not asked to get into the patrol car and he remained at the AM/PM parking lot during the questioning. In light of these circumstances, we conclude that the stopping and questioning did not amount to an arrest. The arrest did not occur until the officers had probable cause.
 
 C. Consent to the Warrantless Search
 
 16
 Chester contends that evidence obtained from the vehicle search should have been suppressed because he did not consent to the search. At the evidentiary hearing, two officers testified that Chester twice gave his consent in a calm manner and provided the officers with a set of car keys. Chester testified that he did not provide such consent. The district judge found that Chester had given his consent. The district judge is in the best position to evaluate the credibility of witnesses. We cannot say that this finding is clearly erroneous.
 
 
 17
 In the alternative, Chester contends that his consent could not have been valid because it was the product of coercion exerted upon him subsequent to the stop, which he claims was a "de facto" arrest and without probable cause. "The mere fact that consent to search is voluntary ... does not mean that it is untainted by a prior illegal arrest." Delgadillo-Valasquez, 856 F.2d at 1299 (citing Brown v. Illinois, 422 U.S. 590, 603 (1975)). A consent can be found voluntary even if given during a valid Terry stop. Because we do not believe the Terry stop amounted to an unlawful arrest in this case (discussed above), Chester's consent could not be the fruit of a prior illegal arrest.
 
 D. On the Scene Identification Procedure
 
 18
 Chester contends that the circumstances of the identification "show-up" were suggestive and should have been suppressed at trial. We review de novo the constitutionality of the pretrial identification procedures. United States v. Johnson, 820 F.2d 1065, 1072 (9th Cir.1987); United States v. Love, 746 F.2d 477, 478 (9th Cir.1984). "To determine whether an out-of-court identification procedure is so impermissibly suggestive as to taint identification testimony in deprivation of the defendant's due process rights, we examine the totality of the surrounding circumstances." United States v. Nash, 946 F.2d 679, 681 (9th Cir.1991). If the show-up was not impermissibly suggestive, the inquiry ends. United States v. Bagley, 772 F.2d 482, 492 (9th Cir.1985), cert. denied, 475 U.S. 1023 (1986); Love, 746 F.2d at 478. Even if impermissibly suggestive, however, automatic exclusion of identification testimony is not required. Id. (citing Manson v. Brathwaite, 432 U.S. 98, 113-14 (1977); Neil v. Biggers, 409 U.S. 188, 189-99 (1972)). "If under the totality of the circumstances the identification is sufficiently reliable, identification testimony may properly be allowed into evidence even if the identification was made pursuant to an unnecessarily suggestive procedure." Id. A number of factors are considered in evaluating the reliability of both in-court and out-of-court identification procedures. See Biggers, 409 U.S. at 199-200; Bagley, 772 F.2d at 492.
 
 
 19
 Our case is similar to that in Bagley. In Bagley, a show-up identification took place within an hour and a half of a robbery. FBI agents transported Bagley to the bank for identification by the teller. The teller observed Bagley in handcuffs, seated in a police car and surrounded by law enforcement officials. After a full view of Bagley and an opportunity to hear his voice, the teller identified Bagley as the robber. There was no evidence in the record suggesting any verbal encouragement by the officers to identify Bagley as the robber. Id. at 492. The court held that this show-up procedure, while suggestive, was a legitimate identification procedure. Id. at 493. Having reached this conclusion, the court found it unnecessary to reach the question of whether the teller's identification was reliable under the test enunciated in Biggers.
 
 
 20
 Here, the identification at the AM/PM took place within an hour of the crime. The victim/teller witnessed Chester wearing the shirt and hat that were discovered in his automobile briefly after the crime. Chester does not contend that these were not his clothes. There is nothing in the record indicating that the officers encouraged the witness to identify Chester as the robber. We do not believe the procedure was so impermissibly suggestive as to give rise to a substantial likelihood of mistaken identification. Id. at 492 (citing cases). This identification procedure was proper, and we therefore need not address its reliability.
 
 Based on the foregoing, we
 
 21
 AFFIRM.
 
 
 
 *
 Honorable Thomas E. Fairchild, Senior Circuit Judge, Seventh Circuit, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3