**UNITED STATES of America, Plaintiff,**

v.

**Jack Manuel ALVAREZ, Jr., Defendant.**

**No. 88–035–JSL.**

United States District Court,
C.D. California,
Los Angeles Division.

Aug. 11, 1988.

Thomas J. Umberg, Santa Ana, Cal., for plaintiff.

Marshall M. Schulman, Schulman & McMillan, Santa Ana, Cal., for defendant.

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

LETTS, District Judge.

This matter is currently before the Court on defendant Jack Manuel Alvarez, Jr.'s ("Alvarez") motion to suppress evidence that was allegedly seized in violation of the fourth amendment. The evidence in question consists of a machine gun, an automatic rifle and a quantity of cocaine, the possession of which accounts for all three counts of the indictment in this case. After careful consideration of the documents submitted in connection with this motion, oral argument by counsel and the testimony of witnesses presented at an evidentiary hearing held July 28, 1988, the Court concludes that the motion must be granted.

## FACTS

The facts, as stated by the United States in its opposition papers and accompanying declarations are relatively straightforward. On May 12, 1988, at approximately 10:28 a.m., an unidentified male caller telephoned the Santa Ana Police Department and said, "I have information of a possible robbery of a bank this morning." The caller refused to identify himself, but claimed that the robbery "is going to happen this morning in about 10 minutes at the Bank of America on 8th and Main. The man is driving a white Mustang GT and he's got explosives with him." When asked by the police dispatcher how the caller knew what was going to happen, the caller responded, "I know it's going to happen. Just believe me, he's there." The caller described the purported bank robber as a tall, dark, male, "looks kinda Mexican," and stated that he was located "in the back of the bank."

Based on this information, several patrol cars were dispatched to the bank. Upon arrival, the officers observed a white Mustang GT in the bank's parking lot. The Mustang was occupied by a dark haired, Hispanic male who was later identified as Alvarez. The officers observed the car and its occupant for approximately 5 minutes. The white Mustang then departed the bank parking lot and headed north on Main Street. The police followed the car in their patrol cars. After a short time, the police stopped Alvarez' car. One of the officers immediately ordered Alvarez over his public address system not to move and to keep

his hands in plain sight. The officers then approached the defendant with their guns drawn. Alvarez was told to step out of the vehicle. As Alvarez stood outside of the vehicle, a bulge was observed under his jacket. A pat-down search revealed two semi-automatic, 9 millimeter pistols. The police then searched defendant's car and found a disassembled M–60 machine gun, an M–16 fully automatic rifle, and a substantial quantity of cocaine in the trunk.

The Court has also considered the following testimony adduced at the July 28, 1988 hearing. The "anonymous caller" referred to above was Michael Enrique Soler ("Soler"), a personal acquaintance of Alvarez. At the time that Soler made the telephone call to the police, Soler had been released on bail while awaiting trial in the San Bernardino Superior Court on charges of sale and transportation of cocaine.

Soler testified that he spent the morning of the day upon which Alvarez was arrested with Alvarez. Soler testified that the two had met for breakfast in Upland and that during this time Alvarez confided in him that he had a gun and that a "big deal was going down." According to Soler, he was intending to go shopping at South Coast Plaza that day. Although admittedly far out of his way, Soler testified that he followed Alvarez to the Bank of America in Santa Ana. As soon as he saw Alvarez turn toward the bank, Soler went directly to a nearby public telephone and called the police to report what he considered to be "a crime in progress."

Soler's testimony that he called the police out of a sense of civic responsibility was not credible. Nothing in his testimony revealed any reason for him to believe that Alvarez was about to rob the bank. Alvarez had no known propensity for bank robbery, and his criminal record did not reflect any.[1]

Soler's conduct after making the call also belies any deep-seated animosity for Alvarez which might account for his action.

After making the arrest of Alvarez, Soler placed a telephone call to Alvarez' father, advised him that Alvarez had been arrested, and recommended that he engage an attorney by the name of James Brustman to represent him. Brustman also represents Soler in the San Bernardino matter. On the same day, and several times thereafter, Soler also had telephone conversations with Debra Chalupnick, who by affidavit describes herself as defendant's girlfriend. Indeed, at the hearing, Soler testified that he felt "bad" about having called the police.

## DISCUSSION

The issue most clearly posed by the facts of this case is whether the police can lawfully stop a vehicle or person with their guns drawn, acting solely on the basis of an anonymous phone call properly identifying where the person could be found, without any supporting objective evidence that a crime is being, has been or is about to be committed. The United States urges that at the time they stopped Alvarez, based upon the phone call and confirmation of Alvarez' location, the police had "reasonable suspicion" to conclude that a crime had been committed which would justify the stopping of Alvarez' vehicle and the approach to him with their guns drawn.

For this proposition, the government relies on the line of cases beginning with *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry* and its progeny, police officers may make an investigatory stop of an individual or vehicles upon less than probable cause if, under the totality of the circumstances, they can point to articulable facts which support reasonable suspicion that the person stopped is engaging in or about to engage in a crime. *Terry*, 392 U.S. at 21, 88 S.Ct. at 1879; *Guam v. Ichiyasu*, 838 F.2d 353 (9th Cir.1988).

As stated in *United States v. Hensley*, 469 U.S. 221, 228–29, 105 S.Ct. 675, 680–81,

---

1. In addition, since Soler himself had a criminal record, and took refuge in his fifth amendment rights numerous times during his testimony, there is little reason to believe that he shares the views of average citizens concerning the public need for preventing crime and apprehending criminals.

83 L.Ed.2d 604 (1985), the law should not require law enforcement officers to refrain entirely from investigating crimes or persons as to whom they have "reasonable suspicion." Moreover, where a police officer has knowledge that a crime has been committed, the perpetrator was armed and dangerous, and the officer has reasonable suspicion that a particular suspect committed the crime, the officer is authorized to take such steps as reasonably necessary to protect the officer's personal safety. *Id.* at 235, 105 S.Ct. at 683. Under such circumstances, the law should not require that the suspect be approached, if at all, by an officer whose weapon is holstered. *Id.* at 235, 105 S.Ct. at 683.

This case does not require the Court to inquire how far *Hensley* may be said to have overruled or limited earlier Ninth Circuit cases which appear to have held that a stop with weapons drawn amounts to an arrest and must be supported by probable cause.[2] In this case, it is clear that at the time Alvarez was stopped, the officers did not have even reasonable suspicion that Alvarez had committed, was committing or was about to commit any crime.

### A. Lack of Reasonable Suspicion

■ The tip received by the Santa Ana Police was that Alvarez was about to rob a bank. It was an anonymous tip, the credibility of which rested not on any facts which the caller purported to have learned by observation, but rather on facts as to which he professed to have independent personal knowledge. The caller did not claim to have seen anything which led him to believe either that Alvarez was going to rob the bank or that he was carrying explosives; he merely made his statements as

truths of which he had independent knowledge.

Other than the claim of personal knowledge, this caller had none of the attributes which other courts have pointed to as adding credibility to his bald statement. He was not known to the person to whom he spoke as a reliable informant. *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). Indeed, the informant was entirely unknown and anonymous even to the police. He was not personally present, nor readily available so that if the information which he provided proved to be false he could be immediately confronted. *Adams,* 407 U.S. at 146, 92 S.Ct. at 1923; *United States v. Sierra–Hernandez,* 581 F.2d 760 (9th Cir.), *cert. denied,* 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed. 2d 333 (1978). He did not predict any of the details of the manner in which the crime would be conducted,[3] nor were his assertions affirmed in any way by Alvarez' actions while under police surveillance.[4]

At the time the police arrived at the bank, they had no reason to believe that Alvarez had actually done anything from which it might be concluded that he was about to rob a bank, or was carrying explosives. All they had was the unadorned statement to this effect from an unidentified informant.[5]

From the time that Alvarez first was observed by the arresting officers until the time he was stopped, he did nothing from which it might be concluded that he had gone to the bank for the purpose of robbing it, or that he was carrying explosives. To the contrary, before stopping him, the police observed Alvarez parked in his vehicle in the bank parking lot for approximately five minutes. Instead of getting

---

2. See *United States v. Strickler,* 490 F.2d 378 (9th Cir.1974). *See also United States v. DeVita,* 526 F.2d 81 (9th Cir.1975); *United States v. Larkin,* 510 F.2d 13 (9th Cir.1974). In light of *Hensley,* it appears that stopping a suspect at gunpoint, where there is a clear threat to the officer's personal safety, is within the *Terry* stop. *Hensley,* 469 U.S. at 235, 105 S.Ct. at 683.

3. See *Illinois v. Gates,* 462 U.S. 213, 245, 103 S.Ct. 2317, 2335, 76 L.Ed.2d 527 (1983).

4. *Gates,* 463 U.S. at 242–44, 103 S.Ct. at 2334–35.

5. See *Adams,* 407 U.S. at 146, 92 S.Ct. at 1923 ("we believe that Sgt. Connolly acted justifiably in responding to his informant's tip. The informant was known to him personally and had provided him with information in the past. This is a stronger case than obtains in the case of an anonymous telephone tip."). *See also* 3 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* Section 9.3(e) at 482–83 (2d ed. 1987).

out of his car and approaching the bank or otherwise acting in a manner consistent with an intent to rob the bank, Alvarez simply left the bank parking lot. The police then trailed him for some distance as he drove unhurriedly away. During this time, the police received no information tending to indicate that the bank had been robbed, or that any other crime had been committed with which Alvarez might have been associated. Nothing in Alvarez' conduct which was observed by the arresting officers suggested that he had gone to the bank parking lot with any criminal intent.[6]

Regardless of whether the lawfulness of the search in question is to be tested on the basis of probable cause or reasonable suspicion,[7] therefore, the search in question was unlawful because it cannot meet either test. Anyone can make an accusation. Anonymous accusations can be made with impunity. Anyone, including the police, can make an anonymous and unidentified phone tip. If the exclusionary rule were not applied to the facts in this case, there would be nothing to stop a police officer who wished to search any person in the hope of finding evidence of a crime from making an anonymous phone call to his own or some other police department, identifying and locating the person to be searched, and accusing him of committing or about to commit some crime. A gunpoint stop cannot be justified on the basis of anonymous and unidentified bald accusations, where nothing else the police observe gives any reason to believe a crime is being, has been or is about to be committed. In such circumstances, there can be neither probable cause nor reasonable suspicion which would justify the gunpoint stop and search.[8]

The importance of this issue should not be minimized. The more broadly the law construes the duty of police officers to investigate suspicious circumstances and their right to do so with drawn weapons, the more likely it becomes that innocent persons will die or be seriously injured. Anytime two people confront each other with weapons drawn, there is a great risk that one or both will shoot.[9] Because the likelihood of tragedy is so high when armed confrontations become necessary, it is of the utmost social importance to clearly and narrowly define the occasions which call for such highly volatile confrontations.

## B. Soler's Cooperation with Law Enforcement Officials

The Court is also troubled at how strongly the evidence points to the possibility that Soler was working with law enforcement officials to create the appearance of reasonable suspicion by which the stop and subsequent search might be justified. Although law enforcement officers testified as to their belief that Soler was not acting in this capacity, and that based upon their experience they would be aware of it if that were the case, this testimony was not wholly credible. The examination upon which these beliefs were based was superficial at best, and was not calculated to reveal any but the most obvious truths. In particular, it seems clear that no effort was made by the government to exhaust the possibility that Soler was cooperating with federal authorities.

Additionally, the record of the hearing contains at least a hint of why Soler might have been cooperating with law enforcement officials when he made the telephone call to the Santa Ana Police. At the

6. Indeed, although the search following the stop revealed evidence of the other crimes with which the defendant is here charged, there remains to this day almost no reason to believe that Alvarez went to the bank parking lot with the purpose of robbing the bank, or that he was carrying explosives.

7. *See supra* note 2.

8. In *United States v. Greene*, 783 F.2d 1364, 1367 (9th Cir.), *cert. denied*, 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986), although the Court

held that the police were justified to make a *Terry* stop, the Court carefully pointed out that the stop was made with weapons holstered, and they were drawn only after the suspect failed to obey a lawful order. *See id.* at 1366.

9. The Court has published as a companion case hereto, excerpts from a previously unpublished opinion, *Murphy v. City of Long Beach*, —— F.Supp. ——, No. CV 84–5383 JSL (C.D.Cal. Nov. 9, 1987), showing a particularly tragic example.

hearing, Soler admitted knowing and making contact with an individual identified as Modesto Perales. The evidence suggested that Perales is an ex-police officer and that he may have been the source of supply of cocaine to both Soler and Alvarez. Although neither counsel nor any witness for the United States seemed to be aware of it at the time of the hearing, the Court takes notice that its own docket contains a three count indictment against Perales for possession with an intent to distribute and for distribution of cocaine. If in fact, in cooperation with the United States, Soler induced Alvarez to go and wait at the bank with cocaine and weapons, and then made the "anonymous" telephone call, a motion to suppress would have to be granted. The government may not manufacture its own "reasonable suspicion" in order to justify an otherwise illegal search.[10]

At the hearing, before taking notice of the Perales indictment, the Court ruled that the defendant had not met its burden of proving that Soler had acted at the behest of the government, and thus, the evidence would not be suppressed on that ground. Were it not otherwise necessary to suppress this evidence, in light of all the evidence before the Court tending to indicate that Soler may have acted in cooperation with law enforcement authorities, the Court would be inclined to at least to invite more evidence on the question. The Court concludes, however, that a supplemental hearing is unnecessary because the motion should be granted solely on the admitted facts as stated by the United States.

IT IS SO ORDERED.

---

10. *See generally* 3 W. LaFave, *supra* note 6, at 484–85. *Cf. United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981) ("officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.")