**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Jack Manuel ALVAREZ, Jr.,
Defendant–Appellee.**

No. 88–5304.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 4, 1989.

Decided March 20, 1990.

---

Thomas J. Umber, Asst. U.S. Atty., Santa Ana, Cal., for plaintiff-appellant.

Marshall M. Schulman, Santa Ana, Cal., for defendant-appellee.

Before SNEED, REINHARDT and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

Appellee, Jack Manuel Alvarez, was indicted in a three-count indictment charging him with possession with intent to distribute cocaine (21 U.S.C. § 841(a)(1)), possession of an unregistered firearm (26 U.S.C. § 5861(d)), and possession of a firearm with the serial number removed (26 U.S.C. § 5861(h)). Appellant contends that the district court erred in suppressing evidence seized after a stop of Alvarez' automobile.

*Background*

On May 12, 1988, at approximately 10:28 am, an unidentified male caller telephoned the Santa Ana Police Department with information of a possible bank robbery that was to take place that morning. The caller refused to identify himself but claimed that the robbery was going to happen "in about 10 minutes at the Bank of America on Eighth and Main. The man is driving a white Mustang GT and he's got explosives with him." The caller described the man in the car as "tall, dark, looks kinda Mexican and he's probably in the back of the bank." When asked how he knew what was going to happen, the caller stated, "I know it's going to happen. Just believe me, he's there."

Based on this information, several patrol cars were dispatched to the bank. Officers observed a white Mustang GT backed into a parking space facing the bank with a Hispanic looking male occupant. The officers observed the car for about five minutes. According to the government, "[a]s other police officers arrived at the bank, one of the police cars drove past the bank, within Alvarez' field of vision," after which the white Mustang GT left the parking lot. The police followed the car for a short distance and then pulled it over. One of the officers, using his public address system, ordered the suspect not to move and to keep his hands in plain view. Three officers approached Alvarez with their weapons drawn, and ordered him out of the car. Alvarez complied with all of the officer's instructions. While placing Alvarez' arm behind his back, one of the officers observed a bulge underneath Alvarez' jacket and removed a loaded nine millimeter pistol from the suspect's right side. Alvarez was handcuffed and a pat down search revealed another loaded nine millimeter pistol and two ammunition clips. The police then searched the trunk of the car and found a partially assembled belt-feed M-6 machine gun, a M-16 fully automatic rifle, ammunition for both of these weapons, and a substantial quantity of cocaine.

At the hearing on the motion to suppress the evidence found in the trunk, the anonymous caller was identified as Michael Soler, a personal acquaintance of Alvarez. At the time Soler made the call he was on bail awaiting trial in San Bernardino on charges of the sale and transportation of cocaine. Soler, at the hearing testified he had spent the morning with Alvarez on the day Alvarez was arrested. Soler testified he was going shopping at South Coast Plaza that day, but that, although out of his way, he followed Alvarez to the bank. When Alvarez turned into the bank, Soler went directly to a phone booth and called the police. Soler also testified that he was not working for the police officer when he made the call. The district court ruled that Alvarez had not met his burden of proof that Soler was acting at the behest of the government

and that the motion to suppress could not be granted on that ground.[1]  694 F.Supp. 734.

In granting Alvarez' motion, the district court concluded that it did not need to address the issue of whether the stop was an arrest because under either a test of probable cause or reasonable suspicion the stop was unlawful.[2]  The government appeals, and we now reverse.

### Standard of Review

Whether there was sufficient founded suspicion to justify an investigatory stop is a mixed question of law and fact that requires a de novo review.  *See United States v. Thomas*, 863 F.2d 622, 625 (9th Cir.1988) (*Thomas*).  Whether an arrest has occurred depends on all the surrounding circumstances and whether, under all the circumstances, "a reasonable person would conclude he was under arrest." *United States v. Patterson*, 648 F.2d 625, 632 (9th Cir.1981) (internal citations omitted); *see also, United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir.1987) (*Buffington*).  Whether a search was lawful presents a mixed question of law and fact reviewable de novo. *United States v. Linn*, 862 F.2d 735, 739–40 (9th Cir.1988); *see also, United States v. McConney*, 728 F.2d 1195, 1204–05 (9th Cir.1984), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

### Discussion

#### A.  Validity of the Investigatory Stop

The government's first challenge to the district court's ruling to suppress the evidence is that the initial detention of Alvarez' vehicle was legal.  Specifically, the government maintains that the officers' detention of Alvarez was based upon a reasonable articulable suspicion of illegal activity.

In order to justify an investigatory stop there must be "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Thomas*, 863 F.2d at 625.  The stop is evaluated by looking at the "totality of the circumstances" and then determining, based upon the whole picture, whether the detaining officers had a particularized objective basis for suspecting the particular person of criminal activity.  *Cortez*, 449 U.S. at 417–18, 101 S.Ct. at 694–95.

The question here is whether the anonymous tip was sufficiently corroborated by police observations to provide the officers with reasonable suspicion to warrant an investigatory stop.  We assume

---

1.  The district court was troubled by evidence that Soler was working with law enforcement officers to create the appearance of reasonable suspicion to justify the initial stop and subsequent seizure.  The court noted that evidence suggested that Modesto Perales, an ex-police officer, may have been the source of cocaine for both Soler and Alvarez.  Further, the court noted that its own docket contained a three-count indictment against Perales for possession with an intent to distribute and distribution of cocaine.  The court stated that, if in fact, in cooperation with the United States, Soler had induced Alvarez to go and wait at the bank with cocaine and weapons, and then made the "anonymous" telephone call, a motion to suppress would have been granted; if it were not necessary to suppress the evidence on other grounds, the district court concluded that it would be inclined at least to invite more evidence on the question.

2.  "A gunpoint stop cannot be justified on the basis of anonymous and unidentified bald accu-

sations, where nothing else the police observe gives any reason to believe a crime is being, has been or is about to be committed.  In such circumstances, there can be neither probable cause nor reasonable suspicion which would justify the gunpoint stop and search.

The importance of this issue should not be minimized.  The more broadly the law construes the duty of police officers to investigate suspicious circumstances and their right to do so with drawn weapons, the more likely it becomes that innocent persons will die or be seriously injured.  Anytime two people confront each other with weapons drawn, there is a great risk that one or both will shoot.  Because the likelihood of tragedy is so high when armed confrontations become necessary, it is of the utmost social importance to clearly and narrowly define the occasions which call for such highly volatile confrontations."
District Court's Memorandum and Order granting defendant's motion to suppress at 8–9.

that the tipster was not working with law enforcement officers to create the appearance of reasonable suspicion by which the stop and subsequent search might be justified.[3]

In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court, in deciding the weight of an anonymous informant's tip, applied a "totality-of-the-circumstances" analysis, requiring a balance assessment of the relative weight of all the "indicia of reliability." *Gates*, 462 U.S. at 235, 103 S.Ct. at 2330–31. In *Gates*, the details of an anonymous informant's letter were corroborated by police observation. The Supreme Court reasoned that the inherently suspect nature of an anonymous tip was diminished by independent corroboration by police of the letter's predictions of future activities of the suspect. *Gates*, 462 U.S. at 244–45, 103 S.Ct. at 2335–36.

The D.C. Circuit has held that an anonymous tip can provide sufficient reasonable suspicion when the tip "was corroborated in every significant detail by [the police officer's] pre-stop surveillance." *United States v. McClinnhan*, 660 F.2d 500, 502 (D.C.Cir.1981) (*McClinnhan*); *see also United States v. White*, 648 F.2d 29 (D.C. Cir.), *cert. denied*, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233, 235 (1981).

In *McClinnhan*, the police were given a detailed description of the suspect and told that he had a sawed-off shotgun in a brief case. The police spotted a man fitting the description standing with a brief case. The police approached the man and initiated an investigatory detention and weapons frisk. They also conducted a warrantless search of the brief case which was next to the man.

The court noted "that it is possible for anyone with a grudge to fabricate a tip whose neutral details, such as clothing or location, would provide the [necessary] corroboration ... for a stop." *McClinnhan*, 660 F.2d at 503. Nonetheless, the court held that the officers' suspicions about the suspect, based on an anonymous tip that,

while lacking facial indicia of reliability, was corroborated in every significant detail by the officers' pre-stop surveillance, justified an investigative detention of the suspect.

Reviewing the facts and surrounding circumstances of this case from the perspective of an experienced law officer, we conclude that the initial warrantless stop was proper because the officers had a reasonable suspicion that Alvarez was involved in criminal conduct. *See Thomas*, 863 F.2d at 626–27; *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir.1986) (*Sutton*). Here, the officers, through an anonymous tip, were informed that a "tall, dark, [male who] looks kinda Mexican" in a "White Mustang GT" was parked in back of the bank and was going to rob the bank. The police were also informed that the man had explosives. The police officers observed Alvarez sitting in a vehicle which fit the description given by the anonymous tipster. The vehicle was parked in the bank's parking lot and was unusually positioned—front end facing outward. The first police officer to arrive on the scene observed the car and its occupant for approximately five minutes; two other marked police units appeared on the scene. The appellant did not depart from the bank until one of these two marked police cars drove within the appellee's line of sight.

"When law enforcement officials corroborate the details of an anonymous informant's tip, the tip can give rise to a reasonable articulable suspicion." *United States v. Rodriguez*, 835 F.2d 1090, 1092 (5th Cir. 1988) (*Rodriguez—Fifth Circuit*). Here, the officers verified each of the details of the tip. These facts were consistent with the actions of a would-be bank robber who decided to take a break until the coast was clear. The anonymous tip, corroboration of the details of the tip, and the pre-stop observations of the police officers gave rise to reasonable articulable suspicion to make an investigatory stop. The "Fourth Amendment does not, particularly where the reported contraband [is explosives], re-

---

**3.** At oral argument, the appellee's counsel stated that he did not want us to address the issue of

the tipster being associated with the government.

quire a police officer to ignore his well-founded doubts and accordingly will permit an investigative detention." 660 F.2d at 503.

Alvarez argues that the activities observed by the police officers are innocent and not probative of criminal activity. "Taken alone he might be correct. But when viewed in light of the tip and other circumstances noted above, this same activity appears highly suspicious. It is not uncommon for seemingly innocent conduct to provide the basis for [reasonable suspicion]." *United States v. Rodriguez*, 869 F.2d 479, 483 (9th Cir.1989) (*Rodriguez—Ninth Circuit*) (citing *Gates*, 462 U.S. at 244 n. 13, 103 S.Ct. at 2335 n. 13); *see also Sutton*, 794 F.2d at 1427. The fact that the officers "did not actually observe any criminal activity is irrelevant," as is the fact that Alvarez could have been at the bank for innocent purposes. *Sutton*, 794 F.2d at 1427. We hold that under the circumstances of this case the officers had a particularized and objective basis for making the investigatory stop of Alvarez' vehicle.

### B. *Validity of the Manner of the Investigatory Stop*

■ After stopping the vehicle, one of the police officers immediately ordered Alvarez not to move and to keep his hands in view. The officers then approached the vehicle with their weapons drawn and ordered Alvarez to step out of the vehicle. Appellant argues that the investigatory stop escalated to a full arrest when he was forced to exit his car at gunpoint necessitating a showing of probable cause.

The Supreme Court has permitted limited intrusions on a suspect's liberty during a *Terry* stop to protect the officer's safety; a police officer may take reasonable measures to neutralize the risk of physical harm and to determine whether the person in question is armed. *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 683–84, 83 L.Ed.2d 604 (1985); *Terry*, 392 U.S. at 24, 88 S.Ct. at 1881–82. In this circuit it has been held that "[t]he use of force does not convert the [investigatory]

stop into an arrest if it occurs under circumstances justifying fears of personal safety." *Buffington*, 815 F.2d at 1300 (*Terry* stop where police officers forced suspects to exit car and lie down on pavement at gunpoint); *accord United States v. Parr*, 843 F.2d 1228 (9th Cir.1988) (briefly placing suspect in police car does not convert a *Terry* stop into an arrest requiring probable cause). *See United States v. Greene*, 783 F.2d 1364, 1367–68 (9th Cir.), *cert. denied*, 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986) (*Greene*) (investigatory stop where officers instructed suspects to put their hands on the car and then drew their weapons); *United States v. Taylor*, 716 F.2d 701, 708 (9th Cir.1983) (*Taylor*) (investigatory stop where officers approached suspects with their weapons drawn after having been warned that the suspects were dangerous).

In this case, the totality of the circumstances indicate that the police conducted an investigatory stop rather than an arrest without probable cause. The police, through their independent observations, verified the details of the anonymous tip. After corroborating the details of the tip, including the suspect's location, description and vehicle, the police officers had additional reason to credit the portion of the tip that indicated the suspect was carrying explosives. "Although approaching a suspect with drawn weapons are extraordinary measures, such police procedures [are] justified ... as a reasonable means of neutralizing danger to police and innocent bystanders." *United States v. Taylor*, 857 F.2d 210, 214 (5th Cir.1988); *United States v. Serna–Barreto*, 842 F.2d 965, 968 (7th Cir.1988) (*Terry* stop does not turn into an arrest as soon as an officer points his gun at the suspect); *Taylor*, 716 F.2d at 708. In *Taylor*, the officers had been warned that the suspects were dangerous and approached the suspects' vehicle with weapons drawn. We held that "[w]hen the officers stopped [the suspects] to question them ... the officers were justified in drawing their weapons in self protection," and the officers' drawn weapons did not convert the *Terry* stop into an arrest. *Taylor*, 716 F.2d at 708–09.

Contrary to appellee's contentions, *United States v. Strickler*, 490 F.2d 378 (9th Cir.1974), does not require a different result. In that case, we held that an armed approach to a surrounded vehicle was an arrest. In *Strickler*, "it is clear that ... the police had no legitimate fear for their safety and only tenuous reasons to believe that the occupants of the car were involved in the drug transaction." *Taylor*, 716 F.2d at 708–09. In the present case, the police officers had strong reason to believe that Alvarez was armed with explosives and legitimate reasons to fear for their safety. We hold that the manner of the stop did not convert the investigatory stop into an arrest.

### C. *Validity of the Frisk*

■ The decision to frisk Alvarez for weapons was similarly justified. "Police are entitled to take steps to assure that the person stopped is not armed." *Greene*, 783 F.2d at 1368. "The purpose of the *Terry* frisk is 'to allow the officer to pursue his investigation without fear of violence.'" *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir.1982), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983) (quoting *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972)). In this case, the corroborated details of the anonymous tip noted by the officers allowed them to form the reasonable suspicion that Alvarez was armed with explosives. Additionally, when the officers placed Alvarez' arm behind his back they observed a large bulge underneath his jacket. The visible bulge was a significant factor in clueing in the officers to Alvarez' possession of a gun. It was thus reasonable for the officers to take the precautionary step of a pat frisk to insure that Alvarez was not armed. We conclude that the officers acted properly in frisking Alvarez.

### D. *Validity of the Search of the Vehicle*

■ The next question is whether the officers' warrantless search of Alvarez' automobile including the trunk was proper. Due to an automobile's mobility, a search warrant does not need to be obtained prior to a search of the automobile. However, the search must still be supported by probable cause. *California v. Carney*, 471 U.S. 386, 394–95, 105 S.Ct. 2066, 2070–71, 85 L.Ed.2d 406 (1985); *United States v. Miller*, 812 F.2d 1206, 1208 (9th Cir.1987). Officers who have probable cause to believe that an automobile contains evidence of a crime may search the vehicle, including the trunk and all containers in which there is probable cause to believe that evidence was concealed. *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). Probable cause exists if, under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Rodriguez—Ninth Circuit*, 869 F.2d at 484.

■ In this case probable cause existed to search the vehicle. The pat frisk revealed two loaded nine millimeter pistols inside the appellee's waistband. The moment the police discovered the two concealed weapons, they had reason to believe that Alvarez was involved in the criminal activity described by the tipster and they were provided with additional reason to suspect that Alvarez possessed explosives. The verified details of the anonymous tip "coupled with [the officers'] experience gave rise to probable cause to believe the car and trunk contained contraband." *Rodriguez—Fifth Circuit*, 835 F.2d at 1093.

■ In the officers' search of the car, two large black bags and a long beige box were found inside the trunk. These containers could easily conceal explosives; additionally, the officers observed a barrel of a rifle protruding from one of the bags. These circumstances justify the officers' search of the bags and box in the trunk.

### *Conclusion*

Accordingly, we reverse the district court's decision to suppress the evidence found in the trunk. The case is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

REINHARDT, Circuit Judge, dissenting:

I dissent. This is a particularly intriguing case because an anonymous tip that was false—and patently manufactured out of whole cloth in at least one crucial respect—resulted in the seizure of evidence that led to the defendant's conviction for an entirely unrelated offense. Because the tip was false, the police could not obtain corroboration of any of its details, other than of wholly neutral facts that failed to suggest the existence of any criminal activity, planned or otherwise.[1] Yet, the majority holds that the police had founded suspicion sufficient to justify a number of police officers' drawing their weapons, stopping an individual at gunpoint, immobilizing him, and then frisking and questioning him. By finding that the wholly innocuous facts observed by the police provided sufficient corroboration for an anonymous tip, and justified the use of force that ensued, the majority lowers even further the constitutional barriers that separate a free society from a police state.

The district court framed the central question in this case as "whether the police can lawfully stop a vehicle or person with their guns drawn, acting solely on the basis of an anonymous phone call properly identifying where the person could be found, without any supporting evidence that a crime is being, has been, or is about to be committed." In actuality, this is not one question but several, with which this court has struggled for years. Among them are two that we must address today: Under what circumstances may police rely on an anonymous tip to form reasonable suspicion for an investigatory stop?[2] What degree of corroboration will establish the reliability of an anonymous tip?

Our struggle with these issues has been complicated by the fact that in many respects the answers are fact-specific and, thus, resistant to the development or application of general principles. Still, our prior decisions and those of the Supreme Court have frequently noted the intrinsic unreliability of anonymous tips. It follows that law enforcement officials must corroborate such tips in significant detail before their reliability can be properly established. Because I do not believe that the Santa Ana police corroborated the anonymous tip at issue here in any significant detail, I conclude that they lacked reasonable suspicion to stop Alvarez.

Under the principles of Terry v. Ohio,[3] " '[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.' " United States v. Thomas, 863 F.2d 622, 625 (9th Cir.1988) (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981)). The lawfulness of the stop depends upon whether the totality of the circumstances, as they existed "at the time the officer initiate[d] the stop," Thomas, 863 F.2d at 625, constitutes "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Cortez, 449 U.S. at 417–18, 101 S.Ct. at 694–95. Under this totality-of-the-circumstances test, the anonymous tip upon which the police relied was insufficient to provide reasonable suspicion to stop Alvarez.

1. Another unusual aspect of this case is that the "anonymous" caller eventually became known, and in fact testified at the suppression hearing. The district court characterized the informant's testimony as follows: "Soler's testimony that he called the police out of a sense of civic responsibility was not credible. Nothing in his testimony revealed any reason for him to believe that Alvarez was about to rob the bank." Moreover, Soler's testimony makes it absolutely clear that he had no information whatsoever suggesting that Alvarez had any explosives. Soler's refusal to reveal the basis for his allegations to the police dispatcher prevented the police from learning that the tip was, at least in most significant respects, Soler's invention—a compelling argument for the importance of ascertaining the basis of an informant's knowledge before relying on such an intrinsically unreliable source. See page 844 infra.

2. The Supreme Court recently granted certiorari in order to address this issue in Alabama v. White, —— U.S. ——, ——, 110 S.Ct. 834, 861, 107 L.Ed.2d 830, 946 (1990) (No. 89–789).

3. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Both the Supreme Court and this court have indicated that anonymous telephone tips are the least reliable source of information. *See Illinois v. Gates*, 462 U.S. 213, 233–34, 237–38, 103 S.Ct. 2317, 2331–32, 76 L.Ed.2d 527 (1983); *Adams v. Williams*, 407 U.S. 143, 146–47, 92 S.Ct. 1921, 1923–24, 32 L.Ed.2d 612 (1972); *United States v. Sierra–Hernandez*, 581 F.2d 760, 763 (9th Cir.) (per Kennedy, J.), *cert. denied*, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978). However, the Supreme Court has held that an anonymous tip may serve as the basis for probable cause where, in light of the totality of the circumstances—including the extent of detail in the tip and police success in corroborating that detail—the police can establish its reliability and the veracity of the anonymous informant. In *Gates*, the informant accurately predicted the conduct of the defendants, describing in detail their unusual travel plans and the *modus operandi* of the criminal activity they would be engaged in. Through surveillance, the police confirmed that the defendants travelled to a location where the drug trade was particularly active. They confirmed that the defendants followed a travel route frequently employed by drug couriers. And they con-firmed the suspicious travel arrangements predicted by the anonymous informant. The confirmation of those details estab-lished the reliability and personal knowl-edge of the informant and provided proba-ble cause for the police to search the defen-dants' property for narcotics.

While there are many distinctions be-tween *Gates* and the present case,[4] the key distinction for our purposes is that here the police could not verify any significant detail of the anonymous tip, and certainly not the allegation that Alvarez planned to rob a bank or that he was carrying explosives. While under police surveillance, Alvarez en-gaged in no behavior that would suggest that he planned a bank robbery and made no moves that would indicate he was arm-ed. He was observed parked in a bank parking lot for five minutes, as if waiting for someone—possibly the anonymous tip-ster. That is the only conduct the police observed.[5] He made no move to enter the bank, and while parked in the lot he did nothing to indicate that a bank robbery was about to commence or that he was awaiting further events before proceeding with criminal conduct. After several min-utes, he drove out of the lot without engag-ing in any suspicious activity whatsoever,[6]

4. *Gates* is a probable cause case and not a rea-sonable suspicion case. The degree of corrobo-ration of details required for reasonable suspi-cion is undoubtedly less than that required in *Gates*. But as the discussion in the text will make clear, the tip in this case involved almost no details and could be corroborated only in the slightest degree. And the details that could be corroborated did not suggest that the suspect was engaged in any criminal activity.

5. The Government claims that Alvarez was parked in an unusual manner, as if planning a getaway. However, the record shows only that Alvarez's car was "backed into a parking place, facing the bank." The record does not show the distance between the car and the entrance to the bank; it does not show the distance between the car and the exit from the parking lot; it does not show whether the driver's side or the pas-senger's side of the car was closer to the bank; it does not show whether the position of Alva-rez's car in the parking space might as easily have resulted from Alvarez pulling forward into his space from the space behind it, as people often do; it does not show whether some or even all of the other cars in the parking lot were parked in a manner similar to Alvarez's. In

short, the record does not support the Govern-ment's claim.

The mere fact that Alvarez was parked with the front end of his car facing out of the parking space and toward the bank is not by itself un-usual, let alone suggestive of a planned getaway. In fact, an informal survey of the judges' park-ing lot in the federal courthouse in Los Angeles on a typical Friday afternoon revealed more than one car which, on the Government's theo-ry, was parked in a manner that suggested that the driver was planning a fast getaway after perpetrating some form of mischief.

6. The Government vaguely suggests some causal relationship between a police car's arrival and Alvarez's departure, and the majority seems un-critically to accept this version of events. How-ever, the record fails to establish that Alvarez's exit was precipitated by the appearance of the police car, or even that Alvarez saw it drive by. While the record is not clear on this point, the Government's argument below was merely that such a connection was "quite possible, maybe even probable." This possibility was never sup-ported by anything more than counsel's sugges-tion, made only after Judge Letts had tentatively ruled against the Government. Indeed, the

and when police stopped him shortly thereafter, they had received no information or reports indicating that a robbery had been attempted. In short, everything about Alvarez's conduct suggested that he had not robbed a bank, was not engaged in a bank robbery, and did not intend to rob a bank. The allegation that Alvarez was carrying explosives also proved ultimately to be untrue.[7]

Thus, the police could not corroborate any significant detail about Alvarez's conduct before stopping him; their anonymous telephone informant's reliability extended only to his ability to offer a description of an individual sitting in his car in a public place. This falls far short of the corroboration deemed sufficient in *Gates,* which the Supreme Court described as a "range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." 462 U.S. at 246, 103 S.Ct. at 2336. Surely, even under the lesser *Terry* standards, reasonable suspicion must be founded upon more than an accurate description of an individual's *present* location and appearance, especially where the allegations of his *future* criminal conduct are called into question by surveillance. In this case, the anonymity of the informant and the inability of the police to corroborate any significant details of his tip preclude any finding that the police had any particularized or objective basis for suspecting Alvarez of criminal activity. *Cortez,* 449 U.S. at 417–18, 101 S.Ct. at 694–95. Because the police had no reasonable suspicion that Alvarez was engaged in or planning to engage in criminal activity, the stop and subsequent searches of Alvarez and his car were illegal under *Terry.*

The majority's discussion of the tip's corroboration—without which the tip is admittedly unreliable—is deficient in three respects. First, the majority asserts that "the officers verified each of the details of the tip." In fact, the officers verified only the fact that a man meeting the anonymous caller's description was indeed parked in, of all places, a parking lot; the *significant* details of the tip were actually called into question by police observation.

Second, the majority asserts that the facts observed by the police "were consistent with the actions of a would-be bank robber who decided to take a break until the coast was clear." Yet even if the facts were as the majority claims—and they are not [8]—*Terry* demands a higher standard. Reasonable suspicion does not exist whenever a citizen's actions are merely *consistent with* the actions of a *would-be* criminal. The majority correctly points out that police need not directly observe criminal activity, but it ignores an important corollary emphasized by the Supreme Court in *Gates:* "In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of *suspicion* that attaches to particular types of noncriminal acts." 462 U.S. at 243–44 n. 13, 103 S.Ct. at 2335 n. 13 (emphasis added). Clearly, behavior does not become suspicious simply because the police are told about it. However, in deciding that the conduct observed by the Santa Ana police adequately corroborated the anonymous tip, the majority fails to indicate a single detail or combination of details that would be suspicious *in the absence of a tip.* This circular manner of analyzing the tip makes it essentially self-corroborating, even though the information supplied by the caller here could

---

written declarations of the officers on the scene all suggest that Alvarez may have waited as long as five minutes after the appearance of the vehicle before leaving the parking lot. The district court found that "[i]nstead of getting out of his car and approaching the bank or otherwise acting in a manner consistent with an intent to rob the bank, Alvarez *simply left* the bank parking lot" (emphasis added). Under these circumstances, any inference that Alvarez was fleeing from police surveillance is entirely unwarrant-

ed, and thus, provides no basis for placing any faith in the anonymous allegation that Alvarez was planning to rob the bank.

7. Although the absence of explosives was confirmed only after the stop occurred, police knew before they stopped Alvarez that he had not engaged in a bank robbery.

8. See notes 5 and 6 *supra.*

have been supplied by anyone within sight of Alvarez at the time, or anyone who had told Alvarez to meet him at the lot.[9]

Third, the majority sums all of this up by stating, "The anonymous tip, corroboration of the details of the tip, and the pre-stop observations of the police officers gave rise to reasonable articulable suspicion to make an investigatory stop." Yet the anonymous tip, which contained no indicia of inherent reliability, was entitled to no weight unless corroborated in significant detail, and police surveillance tended to contradict more significant details than it corroborated.

No prior decision of this court has ever credited an anonymous tip with so little corroboration. The majority cites *United States v. Rodriguez*, 869 F.2d 479, 483 (9th Cir.1989), for the proposition that "seemingly innocent conduct" can provide reasonable suspicion. However, the "seemingly innocent conduct" observed by police in *Rodriguez* involved a number of suspicious details, including large stacks of currency, frequent trips to the airport, and "evasive driving." 869 F.2d at 483. Moreover, there were actually *two* anonymous tips in *Rodriguez*, one of which had already been corroborated when a consensual search of an apartment turned up $140,000 to which a narcotics dog later alerted; and these two tips were supplemented by a third tip from a *known* informant, as well as information obtained from other narcotics officers. *Id.* at 482–83. The majority's citation of *United States v. Thomas*, 863 F.2d 622 (9th Cir.1988), and *United States v. Sutton*, 794 F.2d 1415 (9th Cir.1986), is even more difficult to understand: Neither *Thomas* nor *Sutton* involved an anonymous tip.

Nor does the Fifth Circuit's decision in another case, also entitled *United States v. Rodriguez*, 835 F.2d 1090 (5th Cir.1988), support the result the majority reaches

here. In that case, the investigating customs agent was able to verify that the anonymous informant had accurately stated the license number of a truck that would be lightly loaded with watermelons at a particular fruit company, with room left in the truck for contraband. The agent followed the truck from the fruit company to a small fruit stand, where he observed boxes sometimes used to transport marijuana being *loaded onto* the truck. Because this degree of corroboration far surpasses anything offered by the Government here, the majority's citation of the Fifth Circuit's *Rodriguez* opinion does not provide support for its decision.

The majority suggests that the law of the District of Columbia Circuit would justify finding reasonable suspicion based solely on police confirmation that the anonymous tip correctly described Alvarez and his car and accurately identified their location. *United States v. McClinnhan*, 660 F.2d 500 (1981); *United States v. White*, 648 F.2d 29, *cert. denied*, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233, 235 (1981). We are of course entitled to consider the D.C. Circuit's decisions as persuasive authority, and to follow them if we deem them correct; but here the majority provides no justification for the adoption of that circuit's law over any other principle. *Cf. White*, 648 F.2d at 43 (question whether an anonymous tip corroborated only by observations of innocent details justifies a *Terry* stop is a live and disputed one in circuit and state courts); *Jernigan v. Louisiana*, 446 U.S. 958, 100 S.Ct. 2930, 64 L.Ed.2d 816 (1980) (White, J., joined by Brennan and Marshall, JJ., dissenting from a denial of certiorari and calling for resolution of whether corroboration of innocent details is sufficient for a *Terry* stop); *Alabama v. White*, —— U.S. ——, ——, 110 S.Ct. 834, 861, 107 L.Ed.2d 830, 946 (1990) (granting certiorari on the issue raised ten years

---

9. We need not decide what the result would have been if Alvarez had actually sought to enter the bank, and I express no opinion on that hypothetical question. However, any such case would at least involve a *prediction of future conduct—i.e.,* some conduct on Alvarez's part that was predicted by the informant and was

not observable by the general public at the time of the informant's telephone call. In this case, the anonymous tip described only the current state of affairs in a public place. The *future* conduct, Alvarez's departure from the parking lot, tended to undermine rather than support the reliability of the tip.

earlier in *Jernigan*). Once *White* and *McClinnhan* are examined with care, the majority's endorsement of them becomes extremely troublesome.

First, those decisions appear to be in some conflict with the way this court has handled the corroboration of tips in general and anonymous tips in particular. We have emphasized—as did the Supreme Court in *Gates*—"that when examining information provided by an informant, the two-prong *Aguilar–Spinelli* test, *Spinelli v. United States*, [393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)]; *Aguilar v. Texas*, [378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964)], is 'highly relevant' in determining the value of the information." *United States v. Miller*, 753 F.2d 1475, 1479 (9th Cir.1985) (citing *Gates;* parallel citations omitted); *see also United States v. Angulo–Lopez*, 791 F.2d 1394, 1396–97 (9th Cir.1986). While *Gates* holds that "a weakness in either the 'veracity' or 'basis of knowledge' prong is not fatal," *Angulo–Lopez*, 791 F.2d at 1396, the tips held reliable in *White* and *McClinnhan*—and in the majority's decision today—suffer from more than mere "weakness." All three tips were in the form of anonymous telephone calls to the police which disclosed *absolutely nothing* to show either the informant's veracity or the basis of the informant's knowledge.[10] Our prior decisions deem this "highly relevant," yet the D.C. Circuit is apparently willing to credit anonymous tips fully, "[e]ven without these indices of reliability," *White*, 648 F.2d at 44.[11]

Second, it is difficult to see how the almost nonexistent level of corroboration apparently sufficient under *White* and *McClinnhan* can possibly be consistent with the requirement that an investigative stop be justified by "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Cortez*, 449 U.S. at 417, 101 S.Ct. at 694–95; *Thomas*, 863 F.2d at 625. By appealing to the principles announced in *White* and *McClinnhan*, the majority today approves a seizure based only on an objective manifestation that Alvarez was tall, dark, Mexican, and parked in a bank parking lot. I believe that our prior decisions clearly require more, and I see no justification for adopting the lower level of scrutiny that apparently prevails in the D.C. Circuit.

Finally, I believe *McClinnhan* and *White* would be questionable decisions even if they did not contravene settled principles in this circuit. As the *McClinnhan* court conceded, "[I]t is possible for anyone with a grudge to fabricate a tip whose neutral details, such as clothing or location, would provide the corroboration required by the *White* decision for a stop." 660 F.2d at 502. This by itself permits a significant intrusion on the liberty of those who may be the subject of such fabrications. Apparently, the D.C. Circuit is willing to pay this price, or rather to have it paid by those whom the police are most likely to stop. However, the opinions in *White* and *McClinnhan* fail to note that if the anonymous tipster also fabricates an allegation that the "suspect" is armed or dangerous,

---

**10.** Some anonymous tips have a higher degree of reliability because the details supplied by the informant are so specific, or are of a nature (*e.g.,* a prediction of future conduct) that they establish the personal knowledge of the informant. *Gates,* 462 U.S. at 234, 103 S.Ct. at 2330. The kinds of tips and corroboration of details upon which the D.C. Circuit would apparently allow reasonable suspicion to be founded are of a far lesser order.

**11.** Arguably, not even the D.C. Circuit goes this far. The phrase quoted in the text is in some conflict with the *White* panel's narrower statement, concluding "that an anonymous tip *about an ongoing transaction,* detailed as to time and place, including a specific description of one of the participants and their vehicles as well as

their modus operandi, *and verified by the officers through surveillance in all details* except for the actual possession or exchange of narcotics provides a sufficient basis for a legitimate *Terry* stop to question the occupants as to their identity and visually check inside the car." 648 F.2d at 43 (emphasis added). Likewise, the *McClinnhan* court noted that it was considering "an anonymous tip that, while lacking facial indicia of reliability, was *corroborated in every significant detail* by [the police officers'] pre-stop surveillance." 660 F.2d at 502 (emphasis added). To the extent that *White* and *McClinnhan* require corroboration "in all details" or "in every significant detail," the majority's more expansive decision today is truly unprecedented.

then police officers are entitled to converge upon the "suspect" with guns drawn, issuing orders that would cause any law-abiding citizen considerable distress. Misunderstandings are to be expected in such situations, and the lives of innocent citizens are thereby placed in jeopardy, all without requiring the police to identify anything that is genuinely *suspicious* about the "suspect's" conduct.

In summary, I do not find *White* and *McClinnhan* persuasive, and I find nothing in the majority's discussion of them to allay my concerns about the extent to which they conflict with our prior decisions. Nor do I believe that the majority has otherwise justified its reversal of the district court's suppression order. I would therefore affirm that order on the ground that the Santa Ana police lacked a reasonable suspicion when they stopped Alvarez.